## ANTHONY EDWARD SIMS, Appellant, *v.* THE STATE OF NEVADA, Respondent.

No. 20926

June 27, 1991                    814 P.2d 63

*Morgan D. Harris,* Public Defender, and *Marcus D. Cooper,* Deputy Public Defender, Clark County, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Rex Bell,* District Attorney, and *James Tufteland,* Deputy District Attorney, Clark County, for Respondent.

# OPINION

By the Court, STEFFEN, J.:

Appellant Anthony Edward Sims was convicted, pursuant to a jury verdict, of one count of grand larceny. Sims was also adjudged an habitual criminal and sentenced to a term of life without the possibility of parole. The primary issue Sims raises on appeal is whether his sentence is disproportionate to the crime and therefore violative of the Eighth Amendment's proscription against cruel and unusual punishment. We conclude that Sims was fairly tried, convicted and sentenced and therefore affirm.

The instant grand larceny offense involved the unlawful taking of a purse and wallet containing $476.00. The record reveals ample evidence of Sims' guilt.

At a post-trial hearing before the lower court, Sims was adjudicated an habitual criminal and sentenced to life imprisonment without the possibility of parole. Citing Solem v. Helm, 463 U.S. 277 (1983), Sims contends that his sentence was disproportionate to the gravity of the underlying offense and his prior criminal history, and that the sentence therefore constituted a violation of the Eighth Amendment's proscription against cruel and unusual punishment. We disagree.

The *Solem* court, without purporting to overrule Rummel v. Estelle, 445 U.S. 263 (1980), reacted strongly, albeit by a five to four vote, to a sentence of life without the possibility of parole pronounced upon a criminal defendant whose crimes had been non-violent, never directed against a person, and facilitated by an alcohol component. Nevertheless, the *Solem* majority observed that "[i]n view of the substantial deference that must be accorded legislatures and sentencing courts, a reviewing court rarely will be required to engage in extended analysis to determine that a sentence is not constitutionally disproportionate." *Solem,* 463 U.S. at 290 n.16. Moreover, in *Rummel* the court said that "one could argue without fear of contradiction by any decision of this Court that for crimes concededly classified and classifiable as felonies, that is, as punishable by significant terms of imprisonment in a state penitentiary, the length of the sentence actually imposed is purely a matter of legislative prerogative." *Rummel,* 445 U.S. at 274. Despite the *Solem* court's characterization of the quoted language in *Rummel* as argument only, the comment concerning the quoted material, set forth in footnote 11 of the

*Rummel* opinion, clearly tends to validate the textual premise.[1] In any event, considering both the rarity with which the *Solem*-type of appellate review was projected by the *Solem* court, and the remaining vitality of *Rummel,* we are persuaded that no *Solem* analysis is warranted in the instant case.

The district court judge, who is far more familiar with Sims' criminal background and attitude than the members of this court, sentenced Sims within the parameters of Nevada law. Although we may very well have imposed a different, more lenient sentence, we do not view the proper role of this court to be that of an appellate sentencing body. Moreover, because the Legislature has determined the sentencing limitations and alternatives that our district courts may impose on criminals who habitually offend society's laws, we deem it presumptively improper for this court to superimpose its own views on sentences of incarceration lawfully pronounced by our sentencing judges. *See* Rummel v. Estelle, 445 U.S. 263 (1980). In that respect, we note that our prerogatives and responsibilities are different in capital cases where the Legislature has statutorily mandated a sentence review by this court to assure that the sentence of death is not excessive given the defendant and the crime.

Despite what may appear to be an unduly harsh sentence based upon the record before us, the sentence was lawful and presumably consonant with the judge's perceptions of Sims' just deserts and the punitive attitude of the community in which the judge serves.[2] We therefore sustain the judgment of the sentencing court in the sentence imposed on Sims as an habitual offender.

---

[1] The referenced footnote reads as follows: "This is not to say that a proportionality principle would not come into play in the extreme example mentioned by the dissent, *post,* at 288, if a legislature made overtime parking a felony punishable by life imprisonment." *Rummel,* 445 U.S. at 274 n.11.

[2] The sentencing judge was undoubtedly aware of Sims' extensive criminal history, and concluded from that history that Sims was deserving of the harsh sentence he received. According to the State, Sims had not only committed three prior felonies, including a conviction for armed robbery with use of a deadly weapon, but he had also been arrested forty-one times as an adult, nine of which resulted in misdemeanor convictions. He also had a history of parole violation.

Additionally, we also recognize the very real possibility that Sims will eventually be accorded clemency by the State Board of Pardons. In our recent decision of Smith v. State, 106 Nev. 781, 802 P.2d 628 (1990), we held that the Board of Pardons retains the power under Nevada constitutional and statutory law to commute a sentence of life without the possibility of parole to a sentence allowing for parole. *Id.* at 784, 802 P.2d at 630. This means that Sims could receive parole consideration after only ten years beyond the ten-year sentence he could have received for the immediate offense of grand larceny.

Sims also contends that he was denied a fair trial because of the prosecutor's comments concerning Sims' post-arrest silence. Again, we disagree. Our review of the record reflects that the prosecutor only questioned Sims concerning the inconsistencies between Sims' trial testimony and his statements to the arresting officers.[3] Specifically, both Officers Blasko and Guenther testified that Sims admitted that he took the purse. Indeed, Sims admitted during trial that he told the officers that he would show them where the purse was if they would return his cigarettes and let him go. At trial Sims also testified that he knew where the wallet was because he had seen it thrown out of a passing car. The prosecutor had the right to inquire about the inconsistency during his cross-examination of Sims.

For the reasons noted above, we conclude that Sims' contentions are without merit. We therefore affirm both the judgment of conviction and sentence entered by the district court.

MOWBRAY, C. J., and YOUNG, J., concur.

ROSE, J., dissenting, with whom SPRINGER, J., agrees:

Anthony Sims (Sims) took a purse from a desk at the office of the Las Vegas Sun newspaper. He threw the purse and wallet away and kept the money he had found inside. When Sims was apprehended by police, he returned the money and showed them where he had discarded the purse and wallet. He pleaded guilty to grand larceny. For this non-violent crime, the district court sentenced him as an habitual criminal, giving him life imprisonment without the possibility of parole. He will not be eligible for

---

[3]The exchange that Sims characterizes as an improper comment on his post-arrest silence is as follows:

PROSECUTION: So, the fact of the matter is, sir, that this is the first time that we've heard this story about the mystery vehicle, the story about the Moulin Rouge—
DEFENSE COUNSEL: Your Honor, I'm going to object. I mean that's an improper question. This is the first time. This the first time this jury's sat on this case. He knows that the defendant's testified consistent with this same version.
PROSECUTOR: I'm going to object to this argument.
COURT: Wait a minute. Arguing with each other isn't going to help any.
DEFENSE COUNSEL: He's trying to give the impression, judge, —
COURT: He's cross-examining him. Objection's overruled.
PROSECUTOR: The fact of the matter is that you never told the police officers anything like that, isn't that right, sir?
DEFENDANT: Anything like where I've been?
PROSECUTOR: Correct.
DEFENDANT: No, I didn't tell them nothing.

any relief from his sentence until 20 calendar years have passed. This is an excessive sentence and should be modified by this court. The majority's failure to do so is an abdication of our responsibility and a refusal to correct an injustice when brought to our attention.

The supreme court of this state has repeatedly abstained from appellate review of sentencings when the district court has imposed sentences within the statutory limits. I find it disheartening that the part of the criminal process that has the greatest ultimate effect on the defendant—the imposition of his or her sentence—is the part we decline to review.

We place many important issues such as admissibility of evidence, conduct of the trial, permissibility of discovery, and the sanctity of privileged information within the discretion of our district courts. However, this court has always retained the right to review whether the district court abused its discretion on any ruling made in the course of a trial. While we show deference to the district court's exercise of discretion, we are not hesitant to reverse a case because a district judge abused that discretion in admitting outlandishly prejudicial evidence or refusing to grant a continuance which was clearly warranted. I see no reason for this court to abstain from reviewing the same kind of error made in the exercise of discretion when sentencing. Such an error was made in this case, and we should not allow a broad policy of abstention to keep us from recognizing an abuse of discretion.

Those who oppose appellate review of sentences might argue that the legislature has provided broad parameters defining the range of sentences that trial courts may impose, and that these parameters sufficiently keep sentences in proportion. However, as evinced by this case, that theory does not work. The legislature has made the parameters broad so that trial courts can make sentences proportionally sound by taking into account both (1) the crime committed, and (2) extraneous facts about the perpetrator. It has also provided mandatory enhancement terms for some crimes[1] and minimum sentences for others. While latitude affords trial courts the ability to impose appropriate sentences, it also permits them to impose a sentence that results in an injustice in an individual case. Sentences can be disproportionate in light of punishments imposed for comparable crimes in this jurisdiction, or in light of the degree of danger the offender poses to society.

---

[1] NRS 193.165 provides that the trial court double the sentence if a defendant uses a firearm or deadly weapon in the commission of certain crimes and NRS 193.167 requires that the trial court double the sentence if the victim of certain crimes is over 65 years of age. These are some of the most severe enhancements in the United States.

We often observe two sentences which vary dramatically, even though the two defendants' crimes and backgrounds are similar.

I do not seek to deprive the legislature of its plenary power to weigh the severity of different crimes and to dictate appropriate sentences through statutory law. However, the argument that this court would be usurping legislative functions by reviewing sentences is pure sophistry. Legislatures cannot create enough sentencing law to match the nuances of each crime and perpetrator, and thus they confer on their respective judiciaries some discretion in sentencing. This court, as the highest court in the State of Nevada, has the authority to review any discretionary matter specifically delegated to the judiciary. Since the exercise of discretion in sentencing is an integral part of the criminal judicial process, it should be subject to our review.

The United States Supreme Court has determined that appellate courts may review sentences which are so disproportionate to the crime committed that the punishment violates the Eighth Amendment proscription against cruel and unusual punishment. Solem v. Helm, 463 U.S. 277 (1983). In *Solem,* the defendant was convicted of uttering a no account check for $100. The trial court sentenced him to life imprisonment without possibility of parole under South Dakota's recidivist statute because he had six prior non-violent felony convictions. The Court concluded that the Eighth Amendment prohibits not only barbaric punishments, but also sentences which are disproportionate to the crime committed. *Id.* at 284. In finding that proportionality analysis can apply to any kind of sentence, the Court stated, "It would be anomalous indeed if the lesser punishment of a fine and the greater punishment of death were both subject to proportionality analysis, but the intermediate punishment of imprisonment were not." *Id.* at 289.

Like those who argue that proportionality review should only apply in cases where the punishment is cruel and unusual in kind,[2] the *Solem* court only calls for appellate review where the punishment is so grossly disproportionate that the injustice reaches constitutional proportions. *Id.* at 290. Whether the concept of "constitutional proportions" is truly a type of proportionality as opposed to a degree of proportionality is a question of semantics rather than legal theory. State judiciaries have the power to determine the extent to which their appellate systems will provide for review of sentencing.

---

[2]Courts generally have held that capital punishment differs from all other forms of criminal punishment, in kind rather than in degree. *See* Enmund v. Florida, 458 U.S. 782 (1982); Coker v. Georgia, 433 U.S. 584 (1977); Furman v. Georgia, 408 U.S. 238, 306 (1972).

Many states already provide for this type of review in several different forms. For example, Washington allows for appellate review of sentencing through its state constitution. State v. Fain, 617 P.2d 720 (Wash. 1980). In *Fain,* the court reasoned that the purpose of proportionality analysis, and the objective factors that such analysis requires, is to minimize the possibility that the personal preferences of judges will determine the course of a convict's life. *Id.* at 725; *see also* Coker v. Georgia, 433 U.S. 584, 592 (1977). *Fain* was decided before *Solem,* at a time when the most recent Supreme Court decision upheld the constitutionality of a life sentence for a non-violent felony. *Cf.* Rummel v. Estelle, 445 U.S. 263 (1980). In concluding that it must reduce the defendant's sentence, the *Fain* court realized that whether or not the Constitution requires proportionality review, such review is mandated by a general sense of justice and duty. State v. Fain, 617 P.2d at 728.

The California Supreme Court determined that its responsibility extends to the determination of whether a particular sentence is proportional to the crime. *See* In re Rodriguez, 537 P.2d 384 (Cal. 1975). In *Rodriguez,* the court determined that a life term is excessive punishment for a defendant convicted of committing lewd or lascivious acts with a child. The court found that a life term is not always excessive for that particular offense because the offense is one that could result in grave injury or death in some cases. *Id.* at 390. However, that was not the case in *Rodriguez,* where the court found an abuse in the administration of an otherwise valid, indeterminate sentencing law. Hence, the highest court in California recognized that trial courts must be granted both discretion and deference, but that complete deference could result in grave injustice without some avenue for review.

In a concurrence to an opinion vacating a thirty-six-year sentence for passing bad checks, one justice on the Alaska Supreme Court wrote that, "sentencing is a discretionary judicial function and that it is the province of the judiciary itself, not the executive branch[3] of our government, to correct abuses of such discretion."

---

[3]In accord with this reference, the justice also notes that the alternatives of parole and executive clemency are too speculative for legitimate consideration. *See* Bear v. State, 439 P.2d 432, 440 (Alaska 1968) (Rabinowitz, J., dissenting). This observation applies equally to Nevada. Parole consideration is not available for certain crimes until an inmate serves a specific number of years, and unavailable until one-third of any sentence has been served. With an excessive sentence, any parole consideration can be greatly postponed. The Nevada Pardons Board meets twice a year and considers about a dozen cases a year for sentence reduction. The Board is designed to provide clemency in a few extraordinary cases and not for a systematic review of sentences imposed throughout Nevada.

Faulkner v. State, 445 P.2d 815, 822 (Alaska 1968) (Rabinowitz, J., concurring). With that definitive language, the justice recognized that the appellate judiciary is in the best position to impose a sense of fairness in sentencing, and that the concepts of separation of powers, deference, and abstention do not come into play in this arena.

While vacating the sentence imposed in *Solem,* the Court noted three factors that courts use when considering the proportionality of a sentence. These factors are: (1) the gravity of the offense and the harshness of the penalty,[4] (2) the sentences imposed on other criminals for other crimes in the same jurisdiction, and (3) the sentences imposed for commission of the same crime in other jurisdictions. *Solem,* 463 U.S. at 292. These same factors should apply whether a jurisdiction uses an Eighth Amendment analysis or simple appellate review under an abuse of discretion standard to determine if a particular sentence is excessive. I would prefer the "abuse of discretion" standard.

Application of these factors reveals the injustice of this case. The crime that precipitated Sims being sentenced to life without the possibility of parole was a non-violent taking of property that he returned when he was apprehended. Sims was convicted of only one violent crime, an armed robbery occurring over sixteen years ago. I agree that Sims' record justifies the trial court's classification of him as an habitual criminal. However, the lesser sentence of life with the possibility of parole is a more appropriate punishment for the crime that he committed in this case.[5] Considering the first factor of the *Solem* test, the penalty imposed is disproportionately harsh in light of the gravity of Sims' crime.

Sims notes that the maximum punishment for the crime of grand larceny, standing alone, is ten years in prison and a $10,000 fine. NRS 205.220. On the other hand, crimes which carry a mandatory or possible life sentence without the possibility of parole are of a more serious nature and include (1) first degree murder, (2) first degree kidnapping with substantial bodily harm,

---

[4]Some courts have included in this factor, the nature of the offense or offender with particular regard to the degree of danger that each presents to society. *See* In Re Lynch, 503 P.2d 921 (Cal. 1972).

[5]NRS 207.010(2) provides that the punishment for an habitual criminal like Sims is either life with or life without the possibility of parole. The difference between life with and life without the possibility of parole is significant. If given life with, an inmate is eligible for parole when he or she has served 10 calendar years in prison. NRS 200.030(4)(b). If sentenced to life without, the inmate is never eligible for parole, unless his sentence is commuted to life with by the Pardons Board, and thereafter the Parole Board cannot take any action to parole until the inmate has served 20 calendar years. Nev. Const. art. 5, § 14(2); Smith v. State, 106 Nev. 781, 802 P.2d 628 (1990).

and (3) sexual assault with substantial bodily harm. Sims' crime could not have caused bodily harm to another person. Therefore, it should result in a lesser punishment as suggested by the second factor of the *Solem* test, which provides that the sentence should be proportional to other sentences imposed in the same jurisdiction.

The final factor, comparison of Sims' sentence to those imposed in other jurisdictions, was examined by the *Solem* court itself. The Court stated, "The Court of Appeals found that, 'Helm could have received a life sentence in only one other state, Nevada,' 384 F.2d at 586, and we have no reason to doubt this finding." *Solem*, 463 U.S. at 299. Not only did the *Solem* court require the state to commute the defendant's sentence, but it cited Nevada as the only other state in which the error it corrected could have occurred.

Since our legislature drafts statutes which are broad enough to sustain a margin for error, this court should review sentences claimed to be excessive and thereby provide a remedy when errors do occur. Refusal to do so means that all sentences imposed by the district courts will not be subject to judicial review if it were legally possible to assess them, regardless of how disproportionate the punishment is to the crime committed.